# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**ERIC W. SCHOFIELD,**
    **Plaintiff,**

**v.**                                  **Case No:  8:18-cv-30-WFJ-JSS**

**SURAJ PROPERTIES, INC., HIMANSHU**
**J. PATADIA, PRITA H. PATADIA, and**
**SURAJ INVESTMENTS, INC.**
    **Defendants.**
_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendants, SURAJ PROPERTIES, INC., SURAJ INVESTMENTS, INC., HIMANSHU J. PATADIA, and PRITA H. PATADIA, by and through undersigned counsel, pursuant to Rule 56, Fed.R.Civ.P., and moves this Honorable Court to grant summary judgment in favor of said Defendants and in support thereof state the following:

Defendants are entitled to summary judgment because Plaintiff is not a covered individual under the FLSA, Suraj Properties, Inc. is not a covered entity under the FLSA, Suraj Investments, Inc. is not a covered entity under the FLSA, there is no evidence that any of the Defendants willfully violated the FLSA, alternatively the Plaintiff was satisfactorily compensated pursuant to the provisions of the FLSA, there is no evidence that any of the Defendants willfully violated § 448.110 Florida Statutes[1] (the "FMWA), and the Plaintiff was satisfactorily compensated pursuant to the provisions in the FMWA . Specifically, the Plaintiff does not qualify for individual coverage under the FLSA because the Plaintiff was not engaged in interstate commerce or engaged in the production of goods for interstate commerce. Further, neither Suraj Properties, Inc. nor Suraj

---

[1] § 448.110 is also known as the "Florida Minimum Wage Act".

1

Investments, Inc. qualify for enterprise coverage under the FLSA because neither had an annual gross volume of sales or business of $500,000 or more in any of the years that the Plaintiff alleges to have performed work at the El Jon Motel or the Budget Motel. The Plaintiff is also exempt from making a claim under either the FLSA or § 448.110 Florida Statutes because he was an independent contractor. Finally, even if the Plaintiff was entitled to seek relief under the FLSA or § 448.110 Florida Statutes, he was paid in compliance with the applicable provisions. There are no genuine issues of material fact in dispute. Plaintiffs' claims are without merit, and Defendants are entitled to summary judgment as a matter of law.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. Introduction

Himanshu J. Patadia ("H. Patadia") and Prita H. Patadia ("P. Patadia") are Husband and Wife (collectively referred to as "the Patadias")[2]. (H.P. Aff. ¶ 2). The Patadias are the owners of the two Defendant Florida corporations, Suraj Properties, Inc., and Suraj Investments, Inc. (Id.) Suraj Properties, Inc.'s sole business is the ownership and management of the El Jon Motel (Suraj Properties, Inc. and the El Jon Motel are referred to herein as the "El Jon")[3]. (B Aff. ¶ 3). Suraj Investments, Inc.'s sole business is the ownership and management of the Budget Motel (Suraj Investment, Inc. and the Budget Motel are referred to herein as the "Budget")[4]. (E.J. Aff. ¶ 3). Although it is disputed whether any other personal businesses of the Patadias should be included in this action, they also personally own two duplexes that are located behind the El Jon, two condominium units in Gainesville, and rent U-Haul trucks. (H.P. Aff. ¶ 31). The duplexes are leased

---

[2] A copy of the Affidavit of Himanshu Patadia is filed contemporaneously with this motion and incorporated herein as Exhibit A. ("H.P. Aff.").

[3] A copy of the Affidavit of the Budget Motel is filed contemporaneously with this motion and incorporated herein as Exhibit B. ("B Aff.").

[4] A copy of the Affidavit of the El Jon Motel is filed contemporaneously with this motion and incorporated herein as Exhibit C. ("E.J. Aff.").

to long term tenants and are not a part of the operation of either of the motels.  The two condominiums in Gainesville are occupied by their son and daughter who are students at the University of Florida, however, some rent is received from their children's respective roommates.  All labor required for operation of the U-Haul business is performed by H. Patadia or a representative of U-Haul. (Id.)

In 2011 Plaintiff Eric W. Schofield ("Schofield Sr.") was in need of work and a place to live for him and two of his minor children.  (Id. at ¶ 11).  H. Patadia agreed to allow Schofield Sr. and his children reside at the El Jon and to pay him a flat rate of $120.00 per week, in exchange Schofield Sr. agreed to clean rooms and provide minor maintenance and related tasks.  (Id. at ¶ 12).  In 2012 Amanda Lewis ("Lewis") and her children moved into the El Jon with Schofield Sr. and his children. (Id. at ¶ 13).  A short time later Schofield Sr. advised H. Patadia that he and Lewis needed more space and asked if the El Jon would provide him another room.  (Id.)  Additionally, Schofield Sr., Lewis, and their immediate family members were allowed access to the El Jon's laundry facilities for personal use.  Other customers of the Motels were not provided this access.  (Id. at ¶ 16).

Schofield resided at the El Jon under this arrangement from March of 2011 until September of 2017.  (See H.P. Aff.)  Around 2016 Schofield Sr.'s minor son, E.D.S., began helping Schofield Sr. perform tasks around the El Jon on a sporadic basis.  (Id. at ¶ 25).  Lewis never performed any services on behalf of the El Jon or Budget.  (Id. at ¶ 23).  At no time did Schofield Sr. ever regularly use any instrumentalities of interstate commerce in his performance of tasks for the El Jon or the Budget.  (Id. at ¶ 30).

Schofield Sr., Lewis, and E.D.S. (collectively referred to as "Plaintiffs"[5]), however, contend that they are entitled to an award under the Fair Labor Standards Act ("FLSA") because the

---

[5] Schofield Sr., E.D.S., and Lewis all have related claims pending against the Defendants in this case with a common set of allegations, facts, and defenses.  The cases respectively are: 8:18-cv-00030-WFJ-JSS, 8:18-cv-00031-WFJ-JSS, 8:18-cv-00042-WFJ-AEP.  In certain sections of this motion the three individuals are referred to collectively as "Plaintiffs".

Defendants did not pay them minimum wage or overtime for the work allegedly performed on behalf of the Motels. (See D.E.32). Plaintiffs' theory of FLSA liability suffers from several legal and factual defects. This motion addresses some of those defects, including the most glaring flaw – the Defendants are not a covered entity under either the FLSA's enterprise coverage or individual coverage theories. The FLSA is inapplicable to Plaintiffs' claims because the El Jon generated far less than $500,000 in annual gross revenue, the Budget generated far less than $500,000 in annual gross revenue, and Plaintiffs did not engage in interstate commerce or in the production of goods for interstate commerce. Without access to either theory of FLSA liability, in addition to the other issues discussed herein, Plaintiff's claims fail as a matter of law and Defendants are entitled to summary judgment.

## II.    Factual Background

### A.    The Budget Motel

The Budget Motel is a small "Mom and Pop" business, which has been owned and operated by the Patadia family since 1995. (H.P. Aff. ¶ 3). The Budget generated annual gross volume of sales less than $500,000 during the entirety of the Plaintiffs tenancy at the Budget. (See B. Aff.). The Budget has never hired a single employee outside the Patadia family. (H.P. Aff. at ¶ 5). H. Patadia and P. Patadia primarily managed the Budget on their own. (Id.). H. Patadia's father, Jayendrakumar Patadia ("J. Patadia"), occasionally contributed to the motel by checking in guests and watching the office. The Patadias routinely retained independent contractors to complete major maintenance issues such as renovations or plumbing work. (Id.). The Budget caters to local, low-income residents of the State of Florida. (B. Aff. ¶ 9). The Budget does not advertise out-of-state, or even in any publications, radio, television, or any other widely distributed medium. (Id. at ¶ 5). Many of the Budget's rooms are rented out to customers on a weekly basis who reside there on a long term basis.

4

(Id. at ¶ 4).

## B.      The El Jon Motel

The El Jon Motel is a small "Mom and Pop" business, which has been owned and operated by the Patadia family since 2001.  (H.P. Aff. ¶ 3).  The El Jon generated annual gross volume of sales less than $500,000 during the entirety of the Plaintiffs tenancy at the El Jon.  .  (See E.J. Aff.).  The El Jon has never hired a single employee outside the Patadia family.  (H.P. Aff. ¶ 5).  H. Patadia and P. Patadia primarily managed the  El Jon on their own.  (Id.)  J. Patadia  occasionally contributed to the motel by checking in guests and watching the office.  The Patadias routinely retained independent contractors to complete major maintenance issues such as renovations or plumbing work.   (Id.).  The El Jon caters to local, low-income residents of the State of Florida.  (E.J. Aff. at ¶ 9).  The El Jon does not advertise out-of-state, or even in any publications, radio, television, or any other widely distributed medium.  (Id. at ¶ 5).  Many of the El Jon's rooms are rented out to customers on a weekly basis who reside there on a long term basis.  (Id. at ¶ 4).

## C.      Operation of the Budget and El Jon Motel

The Patadias purchased the Budget in 1995.  (H.P. Aff ¶ 5).  The Patadia's and their children resided in a manager's apartment at the Budget and performed all of the day to day functions for the motel.  (Id. at ¶ 10).  In 2001 the Patadia's purchased the El Jon which is a similar motel to the Budget and is located on an adjoining piece of property.  (Id. at ¶ 5 & 6).  By 2011 the Patadias moved to the apartment at the El Jon and focused on renting rooms at the El Jon to provide lodging.  (Id. at ¶ 8).

Reservations at the El Jon and the Budget (the "Motels") were not taken in advance. Customers renting a room must pay at the front desk prior to receiving a room key.  (B. Aff.  ¶ 6) (E.J. Aff. ¶ 6).  Customers staying at the Motels either pay by the night or per week.  (B. Aff.  ¶ 7)

(E.J. Aff. ¶ 7).  Many of the customers at the Motels would stay for extended periods, even months or years at a time. (B. Aff.  ¶ 4) (E.J. Aff. ¶ 4).  Upon a customer checking in, H. Patadia would complete a registration card.  (B. Aff.  ¶ 8) (E.J. Aff. ¶ 8).  Credit card transactions were run through a processor that was located at the El Jon.  The only people who ever processed credit cards were H. Patadia or P. Patadia.  (H.P. Aff. ¶ 5).

Prior to Schofield Sr.'s arrival, the Patadias performed all of the housekeeping and minor maintenance for the Motels.  (Id. at ¶ 10).  All supplies for the Motels were purchased from local suppliers by the Patadias.  (B. Aff.  ¶ 11) (E.J. Aff. ¶ 11).  Any phone call to either the El Jon or the Budget was routed directly to H. Patadia's cell phone which was always in his possession.  (B. Aff. ¶ 12) (E.J. Aff. ¶ 12).  Since the Patadias purchased the Motels J. Patadia has contributed by checking in guests and watching the front dest.  (H.P. Aff. ¶ 5).

## D.  Plaintiff's Tenancy at The El Jon

In 2011 H. Patadia received a call from a friend who advised him that Schofield Sr. and two of Schofield's children needed a place to live and asked if there was any way that H. Patadia could provide Schofield Sr. a place to stay and potentially some work.  H. Patadia was not in need of any additional help at the time but felt sorry for Schofield Sr. so he agreed.  (Id. at ¶ 11).  H. Patadia agreed to provide Schofield Sr. a room at the El Jon and a payment of $120.00 per week.  In exchange Schofield Sr. would clean motel rooms and provide minor maintenance.  The weekly rate for the room that was provided to Schofield Sr. was $280.00 per week.  (Id. at ¶ 12) (D.E. 72 87:6-14).  Schofield Sr. and his two minor children, one of which was E.D.S., moved into the El Jon in March of 2011.  (Id.).  In May of 2011 Lewis and her children moved into the El Jon with Schofield Sr.  Within a couple of months Schofield Sr. asked H. Patadia to provide a second room for himself, Lewis, and the children.  (Id. at ¶ 13).

**E.    Schofield Sr.'s Tasks at the El Jon and the Budget**

During Schofield Sr.'s tenancy at the El Jon the understanding was that he would provide housekeeping services and minor maintenance.  (Id. at ¶ 12).  Each morning H. Patadia would complete a list which specified the rooms which were occupied or being vacated at the Motels.  If a guest was vacating the motel then the room should be cleaned.  If the customer was staying over for another night then the room would not be cleaned.  There were also rooms which, at the time of making the list, it was not known if the guest would be staying an additional night.  In those instances, the Patadias or Schofield Sr. would check with the guest to determine if they intended to stay.  (Id. at ¶ 21).

There was no specific time that Schofield Sr. was expected to obtain the list in the morning or begin his duties during the day.  On most days Schofield Sr. would pick up the list and return to his room and not begin working until later in the day.  (Id. at ¶ 22).  Cleaning a room is comprised of wiping down furniture and bathroom fixtures, and changing out the bed sheets and the towels.  (Id. at ¶ 17).  It takes on average 10-15 minutes to clean a room.  (Id.).  Although Schofield Sr. did provide these services to the Budget approximately 90-95% of his services were to the El Jon.  (Id. at ¶ 20).

On a limited number of occasions over the 6 years that Schofield Sr. performed services, he was asked to monitor the El Jon while H. Patadia and P. Patadia were not present in case a new customer arrived.  (Id. at ¶ 19).  In those instances, H. Patadia would leave keys and registration cards with Schofield Sr. and he would fill out a card and provide a room key to the customer.  Schofield Sr. never worked the front desk, answered the telephone, or processed credit card transactions.  (Id.).

**F.    Schofield Sr.'s Compensation and Time**

Schofield Sr. contracted to receive $120.00 per week as wells as the value of two rooms per week. The value of each room was $280.00 per week ($560.00 for both rooms). (Id. at ¶ 13). The total compensation that Schofield Sr. received each week was $680.00[6]. (See Id.). Initially Schofield Sr. was paid by check from the El Jon, but shortly after he began providing services he requested that he be paid in cash so that he could avoid paying his child support obligation. (Id. at ¶ 15).

The El Jon has maintained records of the actual time worked by Schofield Sr. dating back to January of 2012. (H.P. Aff. at ¶ 14). From January 2012 until October 2017 the Schofield Sr. never worked in excess of 16 hours. (Id at Exhibit A-1). The highest compensation Schofield Sr. would have ever been entitled to pursuant to Florida's minimum wage[7] in a particular week was $116.33. (See Id.).

## G.    Schofield Sr.'s Other Employment

During the time that Schofield Sr. provided services to the El Jon he was also able to maintain other employment. (See D.E. 74, P. 7-8) Schofield Sr. was able to arrange any services provided to the El Jon in such a way that allowed him to seek and maintain additional income.

## H.    Amanda Lewis' Claim Of Employment

Lewis moved into the El Jon in May of 2011. The Motels claim was never asked to perform any services and that Lewis never performed any services on behalf of the Motels. (H.P. Aff. ¶ 23) Other than the testimony of the Plaintiffs[8] there is no evidence that Lewis provided any services on

---

[6] It has been testified that the 2nd room was provided as compensation for Lewis. (Deposition of Amanda Lewis P. 50:L24-25, P. 51: L 1-11). Although, Defendants contend that Lewis was never hired, never provided services, and was not entitled to compensation, reallocating the amount of 1 room to Lewis would not change any potential entitlement of Schofield Sr. and may act set off any amount claimed by Lewis.

[7] At all times relevant to this complaint Florida's minimum wage requirement was equal to or greater than the federal minimum wage.

[8] "Plaintiffs" include the Plaintiff in this action as well as related actions E.D.S., Schofield Sr., Amanda Lewis.

behalf of the Motels.  In fact, Lewis' own testimony is contradicted by her prior applications to the Florida Department of Children and Families ("FDCF")[9].  During her deposition on May 25, 2018, Lewis testified that she listed the compensation she received from the El Jon in the form of free rent as income on applications with the FDCF.  (D.E. 68, 53:16-55:18).  However, the records of FDCF contradict these statements by Lewis.  A review of the FDCF establish that the only employment/income ever disclosed by Lewis during the relevant time period was with Peterson Cleaners. During the majority of the time at the El Jon Lewis worked at Peterson Cleaners, for the last two years she worked Monday through Friday 8:00 a.m. to 5:00 p.m.  (D.E. 59, 9:5-25) Lewis left the El Jon in October of 2017.  (H.P. Aff. ¶ 28).

## I.      E.D.S.'s Claim Of Employment

When E.D.S. moved into the El Jon with his father, he was eight years old.  (H.P. Aff. ¶ 24). As a child he would sometimes follow his father around the motel while he worked.  (Id.).  In 2016 E.D.S. began helping his father around the motel with some of his tasks.  This was not done at the request of the H. Patadia or P. Patadia.  In fact, H. Patadia had informed Schofield Sr. on numerous occasions that he did not want E.D.S. doing any work around the motel because he was a minor. Schofield Sr. advised H. Patadia that he wanted to teach his son some skills and that is why he was helping him around the El Jon.  (H.P. Aff. ¶ 25).  Any work that E.D.S. did around the motel was limited as he was a high school student at the time attending school on a daily basis.  (See D.E. 38:4-10).  H. Patadia was under the impression that Schofield Sr. was compensating E.D.S. as he saw fit.  E.D.S. moved out of the El Jon in October of 2017.  (H.P. Aff. ¶ 28).

## J.      Plaintiffs' Tenancy Ends

---

[9] A copy of the FDCF produced by Lewis are filed contemporaneously with this motion and incorporated herein as Exhibit D.  ("FDCF Records").

In August of 2017 Schofield Sr. asked for money from H. Patadia to pay a child support arrearage amount to avoid a finding of contempt.  H. Patadia provided the Plaintiff $1,700.00 and advised that it would be an advance on his weekly payments.  (Id. at ¶ 26).  After he received the large lump sum payment from H. Patadia, Schofield Sr. essentially quit providing any services for the El Jon or the Budget.  (Id. at. ¶ 27).  Around that same time the Motels had an unprecedented increase in business because it began providing lodging for victims of Hurricane Irma as part of a FEMA program.  Schofield's arrangement with the El Jon ended when he abruptly left the El Jon without notice in October 2017.  (Id).

K.    **Facts Regarding Individual Coverage under the FLSA**

While performing tasks for the Motels pursuant to the arrangement, Schofield Sr., and to the extent alleged by Lewis and E.D.S., did not at any time: (1) travel to any out-of-state location or any interstate transportation center; (2) use any interstate transportation; (3) process any credit card transactions; (4) use the internet for any work-related purpose; (5) send any mail on behalf of the Motel; (6) make any interstate phone calls on behalf of the Motel; (7) regularly use the telephone or internet for any purpose; (8) book or reserve rooms for guests over the phone; (9) purchase tools, supplies, or any other items or goods for the Motel; or (10) engage in any other activities related to interstate commerce.  (H.P. Aff. ¶ 30).

### III.    Standard

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing

law." *Id.* "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, "Rule 56(e) ... requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation omitted). The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor." *Allen*, 495 F.3d at 1314.

## IV. <u>Argument</u>

Defendants are entitled to summary judgment because the undisputed facts conclusively demonstrate that the FLSA is inapplicable to Plaintiffs' claims because (1) the defendant motels' annual gross revenue was less than $500,000; (2) Plaintiffs did not engage in interstate commerce; and (3) Plaintiffs did not engage in the production of goods for interstate commerce. *See Tony & Susan Alamo Foundation v. Sec'y of Labor*, 471 U.S. 290, 295 n.8 (1985); *Hiar v.Hingston*, 96 F.3d 1448, at *1 n.1 (6th Cir. 1996). The applicability of the FLSA to Plaintiff's claim is a question of law. *See Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986); *Reich v. Stewart*, 121 F.3d 400, 404 (8th Cir. 1997). Since the FLSA is inapplicable in this case as a matter of law, Defendants are entitled to summary judgment.

**A.     Neither the El Jon nor the Budget are Covered Entities Under the FLSA Theory of Enterprise Coverage Because Neither had an Annual Gross Revenue of at Least $500,000.**

Under the FLSA, any employee who is employed by "an enterprise engaged in commerce or in the production of goods for commerce" is entitled to the statute's protections, including federal minimum wage and overtime guarantees, regardless of what work activities the individual employee performed.  *See* 29 U.S.C. §§ 206–07.   The FLSA defines  "enterprise engaged in commerce" as an entity "whose annual gross volume of sales made or business done is not less than $500,000." 29 U.S.C. § 203(s)(1)(A)(ii). "This threshold was enacted to exclude 'Mom and Pop' operations from coverage."  *Farrell v. Pike*, 342 F. Supp. 2d 433, 439 (M.D.N.C.2004).   The calculation of annual gross volume of sales ("AGV") is exclusive of excise taxes.  See 29 U.S.C. 203(s)(1)(A)(ii) and 29 C.F.R. §779.261.

Pursuant to 29 C.F.R. § 779.266(b),

> "in order to determine, when there may be doubt, whether an enterprise or establishment has  annual gross volume of sales made or business done in excess of the amount specified in the statute, and analysis will be made at the beginning of each quarter-year so that the employer will know whether or not the dollar volume tests have been met for the purpose of complying with the law in the workweeks ending in the current quarter-year. The total of the gross receipts from all its sales or business during a 12-month period which immediately precedes the quarter-year being tested will be the basis for analysis ..."

The specific calculation under the rolling quarters method is set forth in *Donovan v. I-20 Motels, Inc.,* 664 F.2d 957, 958 (5th Cir.1981), where the court stated:

> Under [the rolling quarters method], an employer determines if it is covered by the Act at the beginning of each quarter, by calculating its annual dollar volume based on the sum of the four preceding quarters. In other words, on April 1, 1981, the employer totals his gross volume of sales for the year ended March 31, 1981. If the total exceeds [the gross sales requirement] he is covered by the Act for the next quarter; if not, he is exempt from the Act.

### 1.  The El Jon did not have Annual Gross Revenue of at least $500,000

The El Jon did not have an annual gross revenue of at least $500,000 during any of the years of Plaintiffs' tenancy at the El Jon.  (See E.J. Aff. Exhibit B-2).  The gross revenues provided on the El Jon's Federal Tax Returns for the relevant years are as follows:  $117,227.00 in 2011, $108,472.00 in 2012, $104,804.00 in 2013, $107,160.00 in 2014, $128,455.00 in 2015, and $151,911.00 in 2016.  (See Id.).

To the extent that there remains a question regarding whether enterprise coverage exists for 2017 we must analyze that year's revenues pursuant to the rolling quarters method set forth by *Donovan*.  The Plaintiff left the El Jon in October of 2017.  Therefore, pursuant to *Donovan*, we must review the four quarters prior to October of 2017; Q4 of 2016, Q1 of 2017, Q2 of 2017, and Q3 of 2017.  Respectively the gross receipts for the relevant quarters are Q4 2016 $35,976.07, Q1 2017 $27,362.28, Q2 2017 $27,362.28, and Q3 2017 $28,614.07.  (See E.J. Aff. Exhibit B-3).  After deducting the excise taxes, the AGV for the respective quarters are Q4 2016 $32,365.35, Q1 2017 $31,639.99, Q2 2017 $24,752.00, and Q3 2017 $25,793.57.  (Id.).  The AGV under the rolling quarters method for the four months prior to the Plaintiff's departure is $114,550.91.  (Id.).

There is  no disputed issue of fact that the El Jon does not meet the revenue requirements of "an enterprise engaged in commerce or in the production of good for commerce."

### 2.  The Budget did not have Annual Gross Revenue of at least $500,000

The Budget did not have an annual gross revenue of at least $500,000 during any of the years of Plaintiffs' tenancy at the Budget.  (See B. Aff. Exhibit C-2).  The gross revenues provided on the El Jon's Federal Tax Returns for the relevant years are as follows:  $35,205.00 in 2011, $30,108.00 in 2012, $34,691.00 in 2013, $37,083.00 in 2014, $37,083.00 in 2015, and $57,588.00 in 2016.  (Id.).

To the extent that there remains a question regarding whether enterprise coverage exists for 2017 we must analyze that year's revenues pursuant to the rolling quarters method set forth by *Donovan*. The Plaintiff left the Budget in October of 2017. Therefore, pursuant to *Donovan*, we must review the four quarters prior to October of 2017; Q4 of 2016, Q1 of 2017, Q2 of 2017, and Q3 of 2017. Respectively the gross receipts for the relevant quarters are Q4 2016 $12,054.44, Q1 2017 $8,339.31, Q2 2017 $7,755.35, and Q3 2017 $8,449.46. (See Id. at Exhibit C-3). After deducting the excise taxes, the AGV for the respective quarters are Q4 2016 $10,802.38, Q1 2017 $7,536.58, Q2 2017 $7,022.70, and Q3 2017 $7,633.52. (Id.)   The AGV under the rolling quarters method for the four months prior to the Plaintiff's departure is $32,995.18. (Id.)

There is no disputed issue of fact that the Budget does not meet the revenue requirements of "an enterprise engaged in commerce or in the production of good for commerce."

**B.     Even if the El Jon and Budget are Considered a Single Enterprise, they Are Not Covered Entities Under the FLSA Theory of Enterprise Coverage Because Neither had an AGV of at Least $500,000.**

29 U.S.C. §203(r)(1) sets forth than an enterprise can consist of one or more corporate entities which perform related activities for a common business purpose. Although it is contested in this case whether the El Jon and Budget should be considered a single enterprise for purposes of calculation of AGV to determine whether they are subject to jurisdiction of this Court, for the purposes of this memorandum we will analyze the two as if they are a single enterprise. A combination of the AGV of the El Jon and Budget produces far less than the required $500,000.00 necessary for enterprise coverage. However, it is understood that the Plaintiffs argue that all income from H. Patel and P. Patel should be included as well, even though it is clear that their personal income would not be inclusive in this calculation. But for the purposes of this motion we will demonstrate that a combination of all of the revenues still would not trigger enterprise coverage

14

under the FLSA.  The total AGV for all parties for all stated periods are as follows:  2011 -

$166,290.00; 2012 - $160,323.00; 2013 - $157,789.00; 2014 – $162,519.00; 2015 - $191,245.00;

2016 - $220,724.00; and pursuant to the rolling quarters method - $161,655.09.  (See H.P. Aff. ¶ 31-

34 and Exhibit A-2).

Even under the unlikely scenario where all revenues are included as if it were a single

enterprise there is no disputed issue of fact that it does not meet the revenue requirements of "an

enterprise engaged in commerce or in the production of good for commerce."

**C.     Neither the Budget or the El Jon are Covered Entities Under the FLSA Theory of Individual Coverage.**

Because the El Jon and Budget are not an "enterprise" as defined by the FLSA, Plaintiffs can

only proceed by demonstrating that they "engaged in commerce" or "engaged . . . in the production

of goods for commerce."  *See* 29 U.S.C. §§ 206–07; *Tony & Susan Alamo Foundation*, 471 U.S.  at

295 n.8; *Hiar*, 96 F.3d 1448, at *1 n.1.  The undisputed facts show that Plaintiff can demonstrate

neither.

**1.     Plaintiffs Did Not Engage in the Production of Goods for Commerce.**

The FLSA defines the term "produced" as "produced, manufactured, mined, handled, or in

any other manner worked on."  29 U.S.C. § 203(j).     This definition further explains that "for the

purposes of this chapter an employee shall be deemed to have been engaged in the production of

goods if such employee was employed in producing, manufacturing, mining, handling, transporting,

or in any other manner working on such goods, or in any closely related process or occupation

*directly essential to the production* thereof."  *Id.* (emphasis added).  Additionally, the FLSA's

definition of "goods" expressly state that it "does not include goods after their delivery into the

actual physical possession of the *ultimate consumer* thereof other than a producer, manufacturer, or

processor thereof."  29 U.S.C. § 203(i) (emphasis added).

15

Here, neither the Plaintiffs nor the Motels ever engaged in the producing, manufacturing, mining, handling, or transporting of goods. Even considering the services that the Plaintiffs alleged to have perfumed for the Motels, they did not make, produce, manufacture, or transport any goods. Likewise, the Motels are in the *service* industry, not in the production, manufacturing, mining, handling, or transporting industry. Additionally, the Motels were not "directly essential to the production" of any goods, nor were the Motels closely related or directly essential to another entity that engaged in production, manufacturing, mining, handling, or transporting of goods. *See Cent. Aguirre Sugar Co.  v. Castro*, 330 F.2d 68, 71 (1st Cir. 1964) (absent special circumstances, employees of hotel that catered to the general public were not engaging in activities "directly essential" to the production of goods).

The fact that Plaintiffs merely used goods that may have previously traveled in interstate commerce is insufficient because those goods have already been "deliver[ed] into the actual physical possession of the ultimate consumer" and are thus excluded from the FLSA's definition of "goods." *See* 29 U.S.C. § 203(i).  Plaintiff also never made any purchases on the Motels' behalf. (B Aff. ¶ 11) (E.J. Aff. ¶ 11).  Plaintiff only used goods that the Motel had already purchased as the "ultimate consumer," and they played no role in the production or supply chain. *See Davis v. Patel* 2015 WL 1137575 (M.D. Tenn. May 22, 2015)(Finding that motel workers who cleaned rooms, laundered items, swept the parking lot, and performed maintenance work were not engaged in interstate commerce); *See Thorne v. All  Restoration  Servs.,  Inc.*, 448 F.3d 1264, 1268 (11th Cir. 2006) (holding  that  intrastate company did not engage in interstate commerce because it was the "ultimate consumer" when it purchased goods that had previously moved in interstate commerce); *Dunlop v. Indus. Am. Corp.*, 516 F.2d 498, 499-502 (5th Cir. 1975) (wholly intrastate garbage removal service was  the ultimate consumer of the gasoline, which had moved in interstate commerce, used in

operating company's trucks).

2. **Plaintiff Did Not Engage In Commerce, as Defined Under the FLSA, Because He Did Not Work for an Instrumentality of Interstate Commerce Nor Did He Regularly Use the Instrumentalities of Interstate Commerce While Performing Tasks for the Motel.**

To be an employee "engaged in commerce" within the meaning of the FLSA, the employee "must be directly participating in the actual movement of persons or things in  interstate commerce by (i) working for an instrumentality of interstate commerce, e.g., transportation or communication industry employees, or (ii) by regularly using the instrumentalities of interstate commerce in his work, e.g., regular and recurrent use of interstate telephone, telegraph, mails, or travel." *Martinez v. Palace*, 414 F. App'x 243, 245 (11th Cir. 2011) (citing *McLeod v. Threlkeld*, 319 U.S. 491, 493–98 (1943)); *see also Williams v. Henagan*, 595 F.3d 610, 621 (5th Cir. 2010); 29 C.F.R. §§ 776.9–776.11.     In *McLeod*, the Supreme Court explained that only employees who are in the "channels of interstate commerce," such as operating or maintaining transportation facilities, and not "those who *merely affected* that commerce," are covered by the "engaged in commerce" provision of the FLSA. *Id.* at 493−94 (emphasis added); *see also* 29 C.F.R. § 776.9.  Courts in this district have further explained that the test for individual coverage is "whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than *isolated local activity*." *Marshall v. Whitehead*, 463 F. Supp. 1329, 1345 (M.D. Fla. 1978) (emphasis added) (quoting *Mitchell v. C.W. Vollmer & Co.*, 349 U.S. 427, 75 S.Ct. 860, 99 L. ED. 1196 (1955).

a. **Plaintiffs Did Not Work for an Instrumentality of Interstate Commerce.**

Here, Plaintiff did not "directly participat[e] in the actual movement of persons or things in interstate commerce by [] working for an instrumentality of interstate commerce." *Martinez*, 414 F. App'x at 245. First, the Motels are not an instrumentality of interstate commerce.  The Motels'

17

customers consist almost entirely of local, in-state residents. (B Aff. ¶ 9) (E.J. Aff. ¶ 9).  The Motel

does not advertise out-of-state, or even in any publications, radio, television, or any other widely

distributed medium.  (B Aff. ¶ 5) (E.J. Aff. ¶ 5).  Simply put, the Motels are not the type of

locations that out-of-state guests visiting Florida would want to stay.

Other federal courts agree that hotels and motels catering to the general public are not

instrumentalities of interstate commerce.  *See Sobrinio v. Med. Ctr. Visitor's Lodge, Inc.*, 474 F.3d

828 (5th Cir. 2007); *Sabili v. Chase Hotel Mgmt., LLC*, 2011 WL 940230 (M.D. Fla. Feb. 28, 2011)

report and recommendation adopted, 2011 WL 940207 (M.D. Fla. Mar. 17, 2011).  Even if some

guests were from out-of-state, that fact alone is insufficient to qualify Plaintiff's activities within the

scope of the FLSA.  *See Sobrinio*, 474 F.3d at 830 ("That many of the motel guests were out-of-

state does not alter the local quality of Sobrinio's work. His activities took place outside the stream

of travel, after MCVL guests arrived from out-of-state."); *Russell v. Cont'l Rest., Inc.*, 430 F. Supp.

2d 521, 525 (D. Md. 2006) ("While serving out-of-state patrons may 'affect' commerce, this

activity does not reflect that Plaintiff was employed in the 'channels of commerce.'").

### b.    Plaintiffs Only Engaged in "Isolated Local Activities."

Plaintiffs' alleged activities are too attenuated from interstate commerce and are more

properly characterized as isolated local activities.    *See Collado v. Fla. Cleanex, Inc.*, 727 F. Supp.

2d 1369, 1374 (S.D. Fla. 2010); *see also* 29 C.F.R. § 776.11(c).  In *McLeod*, the Supreme Court

held that a cook who worked  for a railroad company preparing and serving meals to workmen

repairing the railroad tracks was not "engaged in commerce" under the FLSA because the employee

"merely affected" interstate commerce and was not "in the channels of interstate commerce."  319

U.S. at 493–98 (1943); *see also Pino v. Painted to Perfection Corporation*, 563 F. App'x 764, 767

(11th Cir. 2014) (holding that employee who painted boats with foreign registries did not have the

type of "close and immediate" connection with interstate commerce that would trigger individual

coverage) (quoting *Kirschbaum v. Walling*, 316 U.S. 517, 525 (1942)).

Federal courts have consistently held that workers performing housekeeping duties are  not

engaged in interstate commerce.  *See, e.g., Sobrinio*, 474 F.3d at 828; *Wirtz v. B. B. Saxon Co.*, 365

F.2d 457, 462 (5th Cir. 1966) ("It has been held that one who does no more than clean a bank is not

so closely related to the commerce of the bank as to be a part of it."); *Duran v. Wong*, 2012 WL

5351220, at *1 (S.D. Tex. Oct. 23, 2012) (restaurant worker "responsible for washing dishes,

cleaning the restaurant, and performing other manual labor as needed" was not engaged  in

interstate commerce); *Aguilar v. LR Coin Laudromat, Inc.*, 2012 WL 1569552, at *5 (D.   Md. May

2, 2012); *Joles v. Johnson Cnty. Youth Serv. Bureau, Inc.*, 885 F. Supp. 1169, 1179 (S.D. Ind.

1995).

### c.      Plaintiff Did Not Regularly Use Instrumentalities of Interstate Commerce.

The Plaintiff did not regularly use the instrumentalities of interstate commerce in his work.

While performing tasks for the Motels, Plaintiff (1) never traveled to any out-of-state location or any

interstate transportation center; (2) never used any interstate transportation; (3) never processed any

credit card transactions; (4) never used the internet for any work-related purpose; (5) never sent any

mail on behalf of the Motel; (6) never made any interstate phone calls on behalf of the Motel; and (7)

never booked or reserved rooms for guests over the phone. (H.P. Aff. ¶ 30).

Plaintiff never used the telephone to accept reservations from customers nor did he process

any transactions by telephone.  (Id. at 30).  The only time that the Plaintiff ever used a telephone

related to the Motels was to communicate with H. Patadia or P. Patadia to discuss tasks.  (Id at 29).

Although, Plaintiff contends that he answered telephone calls, (See D.E. 32 ¶ 74), his limited usage

of the telephone is insufficient to qualify him under the FLSA because it did not facilitate interstate

commerce.  *See Aguilar*, 2012 WL 1569552, at *6 ("[S]imply receiving   mail and phone calls addressed to a business on occasion from another state is not sufficient to conclude that Aguilar participated in the channels of commerce."); *Bowrin v. Catholic  Guardian Soc*., 417 F. Supp. 2d 449, 468 (S.D.N.Y. 2006) ("[P]icking up personal calls for residents that originate out of state[] do[es] not constitute the type of use of the mails or channels of interstate commerce sufficient to trigger coverage under the Act."); *Kitchings v. Florida United Methodist Children's Home, Inc.*, 393 F. Supp. 2d 1282, 1292 (M.D. Fla. 2005)  (plaintiff's "non-commercial" use of the internet in the course of employment was insufficient for FLSA individual coverage).

Finally, Plaintiff must demonstrate that he "*regularly*" used instrumentalities of interstate commerce in his work.  *See Martinez*, 414 F. App'x  at 245; *Reagor v. Okmulgee Cnty. Family Res. Ctr.*, 501 F. App'x 805, 810 (10th Cir. 2012) (telephone use must be a "regular and recurrent part of [plaintiff's] duties"); 29 C.F.R. § 776.10(b) ("regular and recurrent").  The overwhelming majority of Plaintiffs' tasks consisted of housekeeping duties, cleaning Motel rooms and doing laundry. (H.P. Aff. ¶ 20).  Plaintiff assisted customers checking into the Motels only a few times a year and for a few hours each time. (Id. at 19).   Meanwhile, Plaintiff alleges to have "consistently worked more than 40 hours per workweek." (D.E. 32 ¶ 11).   To the extent that Plaintiffs' assisting guests checking in counts as interstate activity, it only constituted a small and insignificant portion of Plaintiff's tasks, and certainly not a "regular" part of Plaintiffs' work arrangement with the Motel.

**L.   The Plaintiff is exempt from Coverage Under the FLSA and the FMWA Because He was an Independent Contractor**

The FLSA was passed to provide certain protection to workers and to lessen "…the distribution in commerce of goods produced under subnormal labor conditions." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727 (1947). Such protections, however, extend only to employees, a term that is broadly defined under the FLSA. 29 U.S.C. §§ 206, 207. These broad definitions,

however, do not bring "independent contractors" within the coverage of the FLSA. See *Id.*. at 728-29; *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013). Additionally, in order to determine whether a proposed worker is viewed as a covered employee or exempted independent contractor, the courts apply an economic realities test using the following six factors:

> "(1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
> (4) whether the service rendered requires a special skill;
> (5) the degree of permanency and duration of the working relationship;
> (6) the extent to which the service rendered is an integral part of the alleged employer's business." *Id.* at 1311-1312.

No one these factors are solely determinative of the issue and are merely to be used as guides. *Id.* Rather, the ultimate question is whether the workers are so dependent upon the business that they come within the protection of FLSA or are sufficiently independent to fall outside of same. *Id.*

In the instant matter, these factors weigh in favor of exempted independent contractor status and the Plaintiff thus falling outside of the protections of the FLSA. As to the first factor, H. Patadia and P. Patadia had very little control over the manner in which Schofield Sr. did his work. In this regard, as noted previously herein, Schofield Sr. performed his tasks on his own schedule. (H.P. Aff. ¶). Additionally, Schofield Sr. was free to perform work for others, if he chose to do so, which in fact he did. (See D.E. 74, P. 7-8)

As to the second factor, Schofield Sr.'s skill certainly impacted his ability to earn a profit. Schofield received a set compensation each week in the form of $120.00 in cash and $560.00 in lodging.  (H.P. Aff. ¶ 14 and Exhibit A-1).  The more efficient and economical that Schofield Sr.

21

performed his tasks, the higher his compensation per hour.  According to Schofield Sr., although

contested by Defendants, Schofield Sr. obtained additional help from time to time in the form of

E.D.S. and Lewis.  (D.E. 59, 83:2-11, 94:17-25).  Of course, paying a helper would perhaps allow

more work to be done, but plainly would impact the money made by Schofield Sr.

       As to the third factor, Schofield Sr. may have utilized some of his own tools, however he

was not generally required to provide his own supplies.  That being said, as stated above, Schofield

Sr. claims that he employed his own help in the form of Lewis and E.D.S.  Although he may have

failed to compensate them for any work performed.

       The fourth factor does not, on its face weigh in favor of independent contractor status.  The

duties performed by Schofield Sr. was housekeeping, laundry, and minor maintenance.  Generally,

the duties performed by Schofield Sr. did not require any special skill.

       The fifth factor also weighs toward exempted independent contractor status. As noted

previously herein, Schofield Sr. chose the time in which he performed tasks.  Even going so far as

obtaining and working other full-time jobs.  The days that Schofield Sr. worked were independently

up to him.  He chose not to perform tasks on Sundays, holidays, birthdays, and any other day he saw

fit not to work.  Having no formalized agreement with the Defendants, Schofield Sr. was free to

terminate the relationship whenever he saw fit, which he ultimately did.  (H.P. Aff. ¶ 28).

       As to the sixth factor, El Jon and Budget are motels, so housekeeping is an integral part of

such business, however, as also noted herein, no single factor is determinative of exempted

independent contractor status.

       Ultimately, the greater weight of these various factors plainly points toward exempted

independent contractor status for Schofield Sr.

**M.**    **Even if Plaintiff is Considered an Employee and this Court has Jurisdiction, the Plaintiff was Compensated in Compliance with the FLSA**

During the time that the Plaintiff provided services for the Motels the Federal Minimum Wage Rate under the FLSA was $7.25 per hour.  *See* 29 U.S.C.§ 206(a)(1)(C).  During the same time period the Florida Minimum Wage Rate increased.  Effective January 1, 2011 the Florida Minimum Wage Rate was $7.25 per hour.  Effective June 1, 2011 the Florida Minimum Wage Rate was $7.31.  Effective January 1, 2012 the Florida Minimum Wage Rate was $7.67.  Effective January 1, 2013 the Florida Minimum Wage Rate was $7.79.  Effective January 1, 2014 the Florida Minimum Wage Rate was $7.93.  Effective January 1, 2015 the Florida Minimum Wage Rate was $8.05.  Effective January 1, 2017 the Florida Minimum Wage Rate was $8.10.  See § 448.110, Florida Statutes; *see also* Florida Department of Economic Opportunity, *Florida Minimum Wage History 2000 to 2017*, http://www.floridajobs.org/docs/default-source/2017-minimum-wage/florida-minimum-wage-history-2000-2017.pdf?sfvrsn=2.

The Plaintiff has generalized that he worked about 12 hours a day for the first year and then about 8-10 hours a day seven days a week for the remainder of his stay.  (See D.E. 59, P. 37-49).  Schofield Sr. stated that he did not do anything to keep track of his hours (See D.E. 59, P. 41).  The El Jon has maintained and produced a record of all hours worked by the Plaintiff and compensation paid since January 1, 2012.  (H.P. Aff. ¶ 14 and Exhibit A-1).  These records indicate that the Plaintiff was paid a rate which compensated him appropriately under both the FLSA and the FMWA.  (See Id.)

### 1.  Claim Under FLSA

In this instance Schofield Sr. relies on conclusory facts and has no specific supporting facts in opposition to the records of the El Jon.  These conclusory facts are insufficient to contradict the evidence presented by the Defendants that the Plaintiff was paid in conformity with the FLSA, therefore summary judgment should be rendered in favor of the Defendants.

### 2. Claim Under Florida

In this instance Schofield Sr. relies on conclusory facts and has no specific supporting facts in opposition to the records of El Jon.  These conclusory facts are insufficient to contradict the evidence presented by the Defendants that the Plaintiff was paid in conformity with the FMWA, therefore summary judgment should be rendered in favor of the Defendants.

### N. Plaintiff Cannot Meet His Burden Of Showing A Willful Violation Of The FLSA or the FMWA For The Purpose Of Extending The Statute Of Limitations To Three Years.

Even if the court declines to find at this stage that the Defendants are not subject to jurisdiction under the FLSA, it can and should find that Plaintiff cannot meet his burden of proving that Defendants willfully violated the FLSA or the FMWA for the purpose of extending the statute of limitations.   Under the provisions of the 29 U.S.C. § 255(a), FLSA claims must be brought within two years of the alleged FLSA violation, unless the violation is willful, in which case the statute of limitations is three years. Id.  It is the Plaintiff's burden to prove that a violation of the FLSA is willful. *Walton v. United Consumers Club*, 786 F.2d 303, 310 (7th Cir. 1986).  Under the provisions of the FMWA claims must be brought within four years of the alleged violation, unless the violation is willful, in which case the statute of limitations is five years.  *See* § 448.110, Florida Statutes, see also § 95(2)(d)&(3)(q).

To meet his burden of proving "willfulness", Plaintiff must demonstrate that the Defendants "either knew or showed reckless disregard for the matter of whether its conduct was prohibited" by the FLSA. *McLaughlin v. Richland Shoe*, 486 U.S. 128, 133 (1988); *see also, Reich v. Waldbaum, Inc.*, 52 F.3d 35, 39 (2d Cir. 1995); *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 679-681 (1st Cir. 1998) (holding that even a legitimate disagreement with the DOL as to the interpretation of the FLSA does not trigger "willfulness" under Section 216(e)'s willful provision).

An employer does not act willfully even if it acts unreasonably in determining whether it is in compliance with the FLSA. *Reich*, 52 F.3d at 39. Negligence is not enough for willfulness. *McLaughlin*, 486 U.S. at 135, n. 13. Indeed, the Supreme Court in *McLaughlin* specifically rejected a test for willfulness that depends on whether the employer sought legal advice concerning its pay practices. 486 U.S. at 134-35; see also *Armitage v. City of Emporia Kansas*, 782 F. Supp. 537, 545 (D. Kan. 1992) (limitations period was two years where plaintiffs produced no evidence that employer knew its plan violated the FLSA).

In the instant case the Plaintiff has presented no proof other than a conclusory allegation that establishes Defendants "either knew or showed reckless disregard" for whether this pay practice was prohibited. Accordingly, Plaintiff cannot meet his burden of proof and this Court should find that a two-year statute of limitations applies to Plaintiff's claim for compensation under the FLSA and a four-year statute of limitations applies to Plaintiff's claim for compensation under the FMWA.

## IV. Conclusion

For the reasons set forth above0, Defendants' Motion for Summary Judgment should be granted and Plaintiffs' claims under the Fair Labor Standards Act should be dismissed with prejudice.

Respectfully Submitted,


*/s/ Kevin M. Kohl*
KEVIN M. KOHL
Florida Bar No. 0578819


## CERTIFICATE OF SERVICE

25

I HEREBY CERTIFY that on this 4th day of March, 2019, a copy of the foregoing has been served to Lydia Zbrzeznj, Esq., Frost Van Den Boom, P.A., P.O. Box 2188, Bartow, FL 33831 at lzbrzeznj@fvdblaw.com and krutenbar@fvdblaw.com.

*/s/ Kevin M. Kohl*
KEVIN M. KOHL
Florida Bar No. 0578819
BOSWELL & DUNLAP, LLP
245 South Central Avenue
Post Office Drawer 30
Bartow, FL 33831
Telephone:  (863) 533-7117
Facsimile:  (863) 533-7412
Email:      Kevin@BosDun.com
2nd Email:  Amber@BosDun.com
Attorney for Defendants